J. LLOYD SUTTIE AND RUTH R. SUTTIE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Suttie v. Commissioner
Docket No. 6242-82.
United States Tax Court
T.C. Memo 1983-358; 1983 Tax Ct. Memo LEXIS 425; 46 T.C.M. (CCH) 516; T.C.M. (RIA) 83358; June 20, 1983. J. Lloyd Suttie and Ruth R. Suttie, pro se. Paula M. Jung, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent has determined deficiencies in petitioners' Federal income taxes and additions to tax as follows: Additions to Tax
Sec. 6653(b),
Sec. 6654,
Year
Deficiency
I.R.C. 1954
I.R.C. 1954
1974
$1,348
$2,713
$173.66
1975
$1,089
$2,866
$249.41
1976
$1,043
$3,940
$237.99
Alternatively, respondent determined that petitioners were liable for section 6651(a) [1] and section 6653(a) additions to tax. Petitioners concede the correctness of the deficiencies and the correctness of the section 6654 addition to tax. On brief, respondent concedes that petitioner Ruth R. Suttie is not liable for the section 6653(b) additions to tax. As a result of these concessions, the only issue remaining for decision is whether petitioner J. Lloyd Suttie is liable for additions to tax under section 6653(b) for 1974, 1975, and *427 1976; or, in the alternative, if no fraud is found, whether both petitioners are liable for additions to tax for those years for delinquency under section 6651(a) and for negligence under section 6653(a). FINDINGS OF FACT At all times material to this case, petitioners were husband and wife residing in New Mexico, a community property State. From 1964 through 1976, petitioner J. Lloyd Suttie (petitioner) was in the business of representing the State Farm Insurance Company in an insurance agency operated under the name "J. Lloyd Suttie Insurance Agency" in Albuquerque, New Mexico. Petitioner Ruth R. Suttie (Ruth) participated in the business by assisting with the bookkeeping in 1974 through 1976, inclusive. Petitioners realized an increasing amount of income from their insurance business. Their income tax returns and business employment tax returns for the late 1950's through 1963 were prepared by a certified public accountant. In 1963 *428 or 1964, petitioner became involved in a controversy with the Internal Revenue Service (IRS) over delinquent taxes and decided not to file income tax returns beginning with the return for 1964 and continuing through 1976. Petitioner informed the certified public accountant who had prepared his earlier returns that, beginning with his 1964 return, he would take care of his own income tax returns. Petitioners did not file timely income tax returns for 1964 through 1976 even though petitioner filed returns of business employment taxes and amounts withheld for his employees for those years. Petitioner did not file an income tax return for 1964 because he did not have the money to pay the tax and at the same time provide for at least the "necessary needs" of his family. He was concerned that if he filed returns without paying the tax or made only partial payment, the IRS would "lock up" his business by attaching his bank account. He was also concerned that State Farm Insurance Company would terminate his agency if he had further trouble with the IRS. Petitioner had no contact with the IRS from the time his income tax return for 1964 was due until he was visited by IRS special agents *429 of the Criminal Investigation Division on November 16, 1977. During 1964 through 1976, petitioners continued to operate the insurance agency. During this same period, petitioners also sold two family residences for sums in excess of the outstanding mortgages, investing some or most of the net proceeds in another residence. On September 21, 1972, petitioner purchased a lot for $4,270; in 1973, he constructed an office building on the lot at a cost of approximately $45,919. The improved lot was mortgaged for $51,000. On August 1, 1977, he sold this property for approximately $105,000. The terms of the sale called for petitioners to receive cash of $30,000 and an installment note for $32,100.02 and for the purchaser to assume the outstanding mortgage of $42,899.98. Prior to the time that his failure to file tax returns was discovered by the IRS in 1977, petitioner did not use or set aside any of the funds from these property sales to pay any part of his accrued tax liabilities. During the 1964--1976 period when petitioner did not file timely tax returns, he was able to borrow money and obtain numerous loans, both business and personal. Prior to IRS' discovery of his failure *430 to file returns in 1977, petitioner did not borrow (or attempt to borrow) money to pay any of his accrued tax liabilities. On November 16, 1977, special agents of the Criminal Investigation Division of the IRS visited petitioner with respect to his failure to file income tax returns for 1964 through 1976. Petitioner admitted that he had filed no returns. When asked why he had not filed returns, petitioner stated that he had the choice between filing returns and paying the tax or providing for the needs of his family. Petitioner also mentioned his altercation with the IRS in 1963 or 1964 referred to above. Petitioner readily made available to the agents his bank records, checking accounts, bank statements, cancelled checks, deposit slips, savings ledgers, payroll records on employees, and Forms 1099 he had received from State Farm Insurance Company. Petitioner at that time maintained a business and a personal bank account. Over the course of her investigation, the special agent had 28 contacts in person or by telephone with petitioner. Petitioner cooperated with the agents in supplying the information needed to determine his tax liabilities, and did not misrepresent any facts *431 to them. On November 18, 1977, petitioner retained an accountant to prepare delinquent income tax returns for the 13 years, 1964 through 1976. The returns so prepared show the following amounts of income and tax liabilities for the 1964--1976 period: Year
Adjusted Gross Income
Tax
1964
$ 9,514
$ 831
1965
7,038
259
1966
9,443
816
1967
9,701
781
1968
9,434
889
1969
14,447
1,953
1970
14,309
1,823
1971
13,153
1,867
1972
21,970
3,498
1973
12,634
1,523
1974
22,613
4,079
1974 (amended)
21,890
3,926
1975
22,317
4,642
1976
30,933
6,838
Total
$219,396
$33,725
For 1974, 1975, and 1976, respondent determined the deficiencies, set forth above, over and above the amounts reported as income for those years. On May 22, 1978, petitioners filed delinquent returns for 1964 through 1968, inclusive, and paid the amount of the tax shown thereon. On July 13, 1978, petitioners filed delinquent income tax returns for 1969 through 1973 and paid the amounts reported as income tax due on the delinquent returns for those years. On July 13, 1978, petitioners filed joint income tax returns for 1974, 1975, and 1976. On February 26, 1979, petitioners *432 filed an amended joint income tax return (Form 1040X) for 1974. On April 11, 1980, petitioners made payments on account of their income tax liabilities for 1974, 1975, and 1976. The special agents recommended that petitioner be prosecuted under section 7203 for failure to file returns for 1974, 1975, and 1976. On July 11, 1980, petitioner pled guilty in the United States District Court for the District of New Mexico to one count of failure to make an income tax return for 1976, in violation of section 7203, and the proposed prosecution for the other two years was dropped. He was found guilty and was sentenced to pay a fine of $1,000, was placed on probation for 2 years, and was ordered to do 120 hours of community service work. Petitioners received taxable community income for 1974, 1975, and 1976, as follows: [2]
1974
1975
1976
Compensation, State Farm
Insurance commissions
and prizes
$49,393 $55,413 $66,303 Employer contributions
574 594 913 Rental income
2,200 1,000 3,100 Commissions, Albany
National Bank
325 75 75 Interest
301 404 385 Net capital gain
4,823 80 80 Total gross income
$57,616 $57,566 $70,856 Less: Business expenses
(30,741)
(31,572)
(36,102)
Total adjusted gross income
$26,875 $25,994 $34,754 Less: Itemized deductions
( 4,677)
( 3,234)
( 3,370)
Exemptions
( 1,500)
( 1,500)
( 1,500)
Total taxable income
$20,698 $21,260 $29,884 *433 OPINION Section 6653(b) [3] provides for a 50-percent addition to tax if any part of any underpayment of a tax required to be shown on a return is due to fraud. As used in this section, fraud is an intentional wrongdoing with the specific intent to evade a tax believed to be owed. ; ; . Although fraud is never imputed or presumed, the required intent may be shown by circumstantial evidence and reasonable inferences drawn therefrom. ; , affd. without opinion . Whether fraud exists with respect to an underpayment of tax is in the final analysis a question of fact, and respondent has the burden to prove fraud by clear and convincing evidence. *434 Sec. 7454(a); ; Rule 142(b). Petitioner makes an impassioned plea that, although he failed to file income tax returns for the years 1964 through 1976, he always intended to pay the tax that he owed. He testified that he did not have the money to pay his 1964 tax when the return was due. From his 1963 or 1964 experience with collection officers of the IRS who, he testified, levied upon his bank account to collect a disputed delinquency of a small amount, he was convinced that if he filed a return and did not pay the tax shown thereon his property would be seized *435 and he would lose his State Farm Insurance Agency. If that happened, he would be unable to support himself and his family, and he, therefore, decided not to file the return. As each subsequent return became due, he found himself still unable to pay the accumulated liability, and he allowed his delinquency to continue. He insists, however, that he was "always mindful of his obligation" and that he "believed he could build his assets until such time as he might have funds sufficient to come forward and pay his obligation to the Government." [4]
*436 Petitioner buttresses his plea with testimony that other creditors, such as banks, were more flexible than the IRS would have been in handling his indebtedness. Some of his loans were renewed repeatedly on his payment of nothing but the accrued interest. Had the IRS followed a more lenient collection policy, he appears to argue, he would have filed returns and paid his tax when he had the money. He also emphasizes that he was "shell-shocked" in World War II and that he still suffers from psychological problems that should be taken into account. Petitioner's plea is one that generates sympathy. He has suffered much--criminal prosecution and conviction, loss of his insurance agency, and the use of virtually all of his property to discharge his tax liability. [5] We fully understand his plea that he has suffered enough, and we do not dispute his contention that the revenue agent who initially handled the case also was of that view. As a court, however, we must apply the law to the facts as disclosed by the evidence and the reasonable inferences to be drawn therefrom. We conclude that respondent has shown that the section 6653(b) additions to tax are applicable. *437 The "willful failure to file a timely return, which may create both criminal liability and an additional civil liability, does not in itself and without more establish liability for a fraud penalty." , revg. in part and affg. in part a Memorandum Opinion of this Court; , revg. and remanding . Both the criminal provisions (sections 7201 and 7203) and the civil provisions (section 6653(a) and (b)) distinguish between willful violation of the revenue laws with intent to evade a tax believed to be owing and intentional disregard of the internal revenue laws but without intent to defraud. Willful failure to file returns for an extended period, however, is "persuasive evidence of an intent to defraud the government." ; , affg. a Memorandum Opinion of this Court. "The critical question is whether the circumstances attending a particular failure to file warrant an inference *438 of intention to evade taxes." . "An extended pattern of nonfiling plus some 'convincing affirmative indication' of the requisite specific intent to defraud warrants imposition of the addition to tax for fraud. ." . It is significant, we think, that the period for which petitioner failed to file income tax returns was not limited to one, two, or three years. The years 1974, 1975, and 1976, here involved, were the eleventh, twelfth, and thirteenth years that he had failed to file returns. During such a long period, while petitioner was accumulating property, including his residence and an office building, we think it unlikely that he continued to maintain his resolve at some future time to dispose of his property and come forward voluntarily and pay his obligation to the Government. For many years, petitioner had run an insurance agency which was engaged in advising others on the investment of their resources and protection against losses and liability, and he was fully aware *439 during this extended period of his legal obligation to file returns, disclose his income, and pay his taxes even though it was inconvenient for him to do so. He had done so in years prior to 1964. Moreover, even though he did not prepare returns or calculate his tax so that he could keep an account of his growing liability, he knew that he owed taxes for each year of his failure to file returns. Yet he filed no returns until respondent's agents caught up with him. At some point in those years in which he filed no returns, and we think it was before 1974, "it must be concluded that he did not intend to file until his nonfiling was discovered. Such conduct constitutes willful concealment of income to evade payment of taxes." ; see . As petitioner engaged in the several relatively large real estate transactions described in our findings, he did not set aside funds or other property for use in the settlement of his tax liabilities but continued to use the proceeds for personal or family purposes or to invest them in other property. Year by year, we infer, *440 petitioner was relying on the hope that, by not filing returns, discovery of his defalcations would be less likely and that he could continue to be able to employ for his own personal or business uses the amounts which he knew should have been paid as taxes. In at least some of the years, he must have had sufficient money to pay his taxes for those years even though it would have been inconvenient. Yet he did not do so. [6] As suggested by Mrs. Suttie's testimony, quoted in part in foot-note 4, supra, petitioner did not want to "throw" it "all out" and decided "to take the chance." "Each year he attempted to conceal his misconduct of the prior years by again not filing a return" for the current year. . Each year we think he knew it would be increasingly difficult to give up his property in order to pay his growing tax debt. Although he cooperated fully with the IRS agents who investigated his case, it is apparent that until the IRS agents called on him "he intended to conceal his failure to file returns and thereby conceal his tax liability." . *441 That petitioner had attempted to conceal his liability is confirmed by his conduct immediately after the IRS agents called upon him on November 16, 1977. At that time, he had substantial sums of money on deposit in his bank accounts, derived from a real estate sale. On November 17, 1977, the day after the IRS agents came to visit him, he withdrew $7,000 from one account, and on the next day, he withdrew $19,000 from another bank account. Then, on November 22, 1977, he redeposited the $19,000. He testified that he withdrew the money because he was "scared" the IRS would get it. Although petitioner at the trial rationalized his action by testifying that he wanted to keep control of the money so that he "could file it with our income tax," his initial reaction to the investigation was hardly consistent with his declared intention to settle with the IRS as soon as he was financially able to do so. His conduct was more consistent with an intention to continue to evade the payment of his taxes. Petitioner's plea that, as a result of experiences in World War II, he suffers from psychological problems that he describes as "shellshock" will not suffice. Other than his own description *442 of his problem, the record contains no evidence as to how it affected his ability to function in the business world. He states on brief that "even now, Petitioner does not understand how he has arrived at this point." We must weigh the assertions of shellshock against his operation of a fairly successful insurance agency over the 13 nonfiling years, his active participation in church and community affairs during that period, and his declared resolve to settle with the IRS some day. We do not think his psychological problems affected his intent to continue to evade the payment of his taxes unless and until the IRS made a demand that he meet his obligations. In view of petitioner's failure for 13 years to file any income tax returns, his knowledge of his obligation under the law to file returns and pay his taxes, his successful operation of an insurance agency during that period, his income-producing real estate transactions, his standard of living, his failure to take any steps during the 13-year period to discharge his tax obligations until he was confronted by the IRS agents and the prospect of criminal prosecution, his immediate withdrawal of cash from his accounts in order *443 to place it beyond the reach of the IRS (even though he redeposited part of it), and the inadequacy of his explanations of his failure to comply with the law, we conclude that the section 6653(b) additions to tax are applicable. To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted. All Rules references are to the Tax Court Rules of Practice and Procedure, unless otherwise noted.↩
2. Petitioners have conceded that the amounts of self-employment taxes due for 1974, 1975, and 1976 are $1,043, $1,114, and $1,209, respectively.↩
3. SEC. 6653. FAILURE TO PAY TAX. (b) Fraud.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the under-payment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse.↩
4. Petitioner Ruth Suttie described their situation as follows: Q. For the year 1964, Mrs. Suttie, why did you not file a tax return? A. Because we didn't have the money to pay it * * * because of the things that he [petitioner] had been through. He knew that he would not be able to pay it, and he would lose his business, and we had six children to support, and we didn't feel that we wanted to throw that all out, we wanted to take the chance, and we thought we would be able to catch up with it, and the thing snowballed, there was just never any point where we could, and it was never our intention not to pay. We wanted to at any point that we could, but there was never any time in there that we were able to.↩
5. Petitioner testified that he has paid the IRS $75,400 and the New Mexico State Tax Division $25,000 in taxes, interest, and penalties. The filing of delinquent returns and the payment of the tax shown thereon, however, does not erase liability for the sec. 6653(b) additions to tax. ; see also sec. 6653(c)(1).↩
6. Petitioner and his family lived at least reasonably well. From 1964 through 1976, he sold two family residences for sums in excess of the mortgages; in 1970, he sold an office building; in 1973, he sold another office building for $105,000, receiving over and above he assumed mortgage $30,000 in cash and a $32,100.02 installment promissory note. In 1972 or 1973, he bought a new 1973 Oldsmobile. From 1964 through 1974, he maintained membership in a "European Health Spa" or a similar facility.↩